FILED
2023 Nov-16  PM 03:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JOHN YORK,                              )
                                        )
            Plaintiff                   )
                                        )
    vs.                                 )     Case No.   5:21-cv-01394-HNJ
                                        )
JERRY WILLIAMS and MAX                  )
SANDERS,                                )
                                        )
            Defendants.                 )

## MEMORANDUM OPINION AND ORDER

Plaintiff, John York, asserts claims against Jerry Williams, the Jail Administrator of the Lawrence County, Alabama, Detention Center,[1] for excessive force pursuant to 42 U.S.C. § 1983, and for assault and battery pursuant to Alabama state law.    (Doc. 1, ¶ 36 ("This Count applies only to Defendant Jerry Williams."); *id.* ¶ 53 ("This Count applies only to Defendant Jerry Williams.")).    York also asserts a claim against Max Sanders, the Lawrence County Sheriff, for deliberate indifference to serious medical needs pursuant to 42 U.S.C. § 1983.    (*Id.* ¶ 44 ("This Count applies only to Defendant Max Sanders.")).    Attorneys filed the Complaint on York's behalf, but on May 4, 2022, the court permitted York's attorneys to withdraw. (Doc. 19).    York now proceeds *pro se.*

On March 9, 2023, Defendants filed a motion for summary judgment in their favor on

---

[1] York's Complaint refers to Williams as the "Chief Correctional Officer of the Lawrence County Jail" (Doc. 1, ¶ 2), but York declared he served as Jail Administrator (Doc. 33-9, ¶ 2), and York has presented no contrary evidence.   In any event, no evidence indicates the two job titles materially differ.

all claims.   (Doc. 32).   On March 10, 2023, the court ordered York to respond to the motion within 21 days.   (Doc. 36).   The court also advised York his response

> must comply with Federal Rule of Civil Procedure 56.   *See Griffith v. Wainwright*, 772 F.2d 822 (11th Cir. 1985).   When a motion for summary judgment is supported by affidavits or other documents, the party opposing the motion must respond with his own affidavits or documents containing specific facts demonstrating that there is a genuine dispute of material fact to be litigated at trial.   *Pro se* parties also may rely on any specific facts pled in a sworn complaint to create a genuine dispute of material fact.   *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)).   If the plaintiff does not comply with Rule 56, the court may accept as true the facts in the defendants' affidavits and other supporting evidence, find that there are no genuine disputes of material fact, and enter summary judgment for the defendants.   A summary judgment is a final adjudication on the merits.

(*Id.* at 1-2).   The court attached to the order a description of Rule 56's requirements.   (*Id.* at 3).

Defendants served York, presently incarcerated in an Alabama State prison, with copies of the motion for summary judgment (Doc. 32), brief (Doc. 34), and supporting evidence (Doc. 33), and the court sent a copy of the afore-mentioned order to York's last known address.   (Doc. 36).   Moreover, during his January 30, 2023, deposition, York affirmed his desire to continue pursuing the case without an attorney.   (Doc. 33-3, at 4).   However, despite the court's directives, York failed to respond to the motion for summary judgment.

Based upon Defendants' submission and the evidence in the file, the court concludes no genuine disputes exist as to Sanders's lack of personal knowledge of a substantial risk of serious harm.   Therefore, the court will grant summary judgment in Sanders's favor on York's claim for deliberate indifference to serious medical needs.   However, genuine fact

disputes exist as to Williams's continued use of force after he had subdued York.    Therefore, the court will deny Williams summary judgment on York's excessive force claim.    Moreover, as genuine disputes exist as to whether Williams violated York's constitutional right, Williams cannot receive state immunity from York's state law claims for assault and battery, and the court will deny Williams summary judgment on those claims.

## SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."    Fed. R. Civ. P. 56(a).    The

> "party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor.    *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted).    The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion."    *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).    In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at

3

trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 577 U.S. 1139 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element

of a non-movant's claim or defense.   *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted.   *Anderson*, 477 U.S. at 249-50.   The movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party."   *Id.* at 248.   That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."   *Id.* at 249.

The court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004) (citing *Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir. 1988) (*per curiam*)).   As such, the court must at least "review all of the evidentiary materials submitted in support of the motion for summary judgment," and the court's order must indicate it addressed the merits of the motion.   *Id.* at 1101-02 (citations omitted).

## FACTS

Plaintiff, John York, presented neither a sworn complaint nor an evidentiary submission.   Therefore, the court garners the relevant facts from Defendants' evidentiary submission, yet it draws all reasonable inferences in York's favor.

On September 23, 2019, officers booked York into the Lawrence County Detention

5

Center.   (Doc. 33-4, at 2-3, 8; Doc. 33-9, ¶ 3).   A booking officer recorded York's answers to a series of standardized screening questions about his medical and mental health history, and the officer forwarded those responses to the onsite contract medical provider, Quality Correctional Health Care (QCHC).   (Doc. 33-4, at 4-7; Doc. 33-9, ¶¶ 4-5).   On October 6, 2019, a QCHC nurse conducted an initial medical assessment of York.   (Doc. 33-5, at 2-4; Doc. 33-9, ¶ 7).

During the early morning hours of October 27, 2019, York escaped from the Lawrence County Detention Center.   (Doc. 33-9, ¶ 8).   Another inmate, Harry Boughter, attempted to escape with York, but as discussed later, officers apprehended Boughter before he could scale a fence.   (*Id.* ¶ 9).   During an interview conducted after York's capture the following day,[2] York stated he perpetrated the escape by obstructing the lock on a cell block door with bits of trash, then later opening the door with materials fashioned from a disassembled broom. (Doc. 33-2 (interview video), at 03:13-03:40, 04:33-04:50; 12:18-12:56; Doc. 33-9, ¶ 10). However, during York's January 30, 2023, deposition, he testified he used a fishing pole with minnow bait to open the cell block door.   He also testified he called Defendant Williams's cell phone from a cell phone he obtained from Defendants' attorney, and Williams allowed him to escape.   (Doc. 33-3, at 10-11).   No video evidence exists of the indoor aspects of the escape.

Surveillance video footage from the early morning hours of October 27, 2019, depicts

---

[2] Officers advised York of his *Miranda* rights at the beginning of the video, but they did not place him under oath.   (Doc. 33-2, at 00:00-00:50).

an outdoor recreation yard directly adjacent to the Detention Center building and surrounded by a metal fence with razor wire curled at the top.    There also exists a second metal fence, also topped with razor wire, surrounding an exterior yard.    (Doc. 33-1, at 00:00).    Beginning at 2:15:07 a.m., two individuals climb over the first, interior fence after placing blankets over the razor wire.    The video does not clearly depict whether the individuals fall to the ground on the other the side of the fence, or whether they safely land.    An equipment box resembling a heating, ventilation, and air conditioning (HVAC) unit sits next to the building on the other side of the fence.    The video does not clearly depict whether either individual contacted the equipment after they scaled the fence.    (*Id.* at 00:00-01:46).    After reaching the ground in the exterior yard, the two individuals run across the yard toward the second, exterior fence. As they make their way around the exterior fence, they encounter an officer and reverse course, running back toward their original direction.    (*Id.* at 01:50-02:28).

Officer Nathan Johnson, who monitored surveillance cameras in the Detention Center's control pod on October 27, 2019, testified he observed York and Boughter in the North Recreation Yard at 2:15 a.m.    (Doc. 33-10, ¶¶ 1-3).    Officer Conner Melson, who worked in the control pod with Johnson, immediately left the pod to thwart the escape. (Doc. 33-10, ¶ 4; Doc. 33-11, ¶¶ 2-3).    Johnson notified dispatch of the situation, secured the facility's doors, and called for relief in the control pod so he could leave to assist Melson. (Doc. 33-10, ¶ 5).    In the meantime, as Melson walked behind the facility, he encountered York and Boughter walking in his direction.    In accordance with the video footage described above, Meslon testified York and Boughter spotted him and turned to run toward the

perimeter fence beside the sally port.    (Doc. 33-11, ¶¶ 4-5).

Melson drew his Taser and chased York and Boughter, commanding them to stop. He caught up to the inmates at the perimeter fence beside the sally port.    York had already scaled the fence by covering the razor wire at the top of the fence with a blanket, but Boughter, who had not yet scaled the fence, surrendered, and Melson returned Boughter to custody. (*Id.* ¶¶ 6-8; Doc. 33-1, at 02:29-02:53).    The video does not depict York scaling the exterior fence or Melson capturing Boughter.

Defendants assert York fell while crossing one of the fences and landed on an HVAC unit, damaging the unit.    (Doc. 33-11, ¶ 9; Doc. 33-9, ¶¶ 12-13).    However, as discussed, no video evidence exists of York crossing the exterior fence, and the existing video does not clearly depict whether York contacted the HVAC equipment when he scaled the interior fence. During his post-capture interview, York stated he believed he broke his ribs when he fell over the fence (Doc. 33-2, at 04:07-04:15), but during his deposition, he testified he broke his ribs by falling on his fishing pole.    (Doc. 33-3, at 28-29).    He also testified Peter Pan helped him over the fence and took him to Never Never Land, and Williams floated in the clouds with him.    (*Id.* at 13).    He intimated officers may have coerced him into stating he injured himself by falling during the escape:    "I stood in front of a lieutenant and captain with the man behind the door, who tried to jump me again if I said something different on the tape."    (*Id.* at 9; *see also id.* at 14-15 ("I told them that [I broke ribs falling on an air conditioning unit] because they said they proper going to beat me again."), 22 ("They said I fell over the fence, and landed on the air conditioner unit.    And that's what they wanted me to say, too.")).    York asserted it

defies logic that a man would "fall on an air conditioner, hop straight up like a rabbit, and out run every police there with a punctured lung for three days."   (*Id.* at 14).

After clearing the perimeter fence, York ran into the woods.   (Doc. 33-9, ¶ 14 (stating York ran south); Doc. 33-11, ¶ 10 (stating York ran north)).   The Sheriff formed a search party, but York evaded immediate capture.   (Doc. 33-9, ¶ 15).   After exiting the woods, York took shelter in a dance studio in the City of Moulton, as he found the door unlocked. He locked the door and remained in the studio until October 28,[3] when Johnson and Officer Wheeler Lovelady located and arrested him after a tip from a drink machine vendor.   (Doc. 33-9, ¶¶ 16-17; Doc. 33-2, at 07:12-07:32; Doc. 33-3, at 22).   Johnson and Lovelady handcuffed York and walked him toward the door of the studio to place him in a police vehicle.   According to York during his deposition, while they walked down the hallway of the studio unspecified officers began to choke York, causing him to experience a seizure and lose consciousness.   (Doc. 33-3, at 24-25).

Williams traveled to the scene of York's capture for a brief period of time, but he denies using any force on York, and he did not witness any other officer using force on York.   (Doc. 33-9, ¶ 18).   However, York testified during his deposition that after Johnson and Lovelady placed him in the back seat of a police vehicle with his hands cuffed behind his back, he

---

[3] York testified he "stayed gone for three days" (Doc. 33-3, at 4), but records clearly reflect officers apprehended him on October 28, 2019, the day after his escape.  In addition, during York's post-capture interview, officers asked him about his whereabouts the previous day, and York did not refute their timeline. (Doc. 33-2, at 06:28-06:34).  York also stated he called a close friend to pick him up "yesterday."  (*Id.* at 17:14-17:16).

regained consciousness.   Williams approached him and said, "You run from my county jail, you little bitch and make me look like an idiot."   Williams then hit York on the side of his head with handcuffs wrapped around his hand.   York attempted to move away from Williams, but Williams pulled York back toward him and continued punching him.   Other officers, including Tim Owens, a City of Moulton officer, spit in York's face and took photographs of the beating.   Owens then slapped and punched York.   Unidentified officers stomped the top of York's hand and spit in his face.   (Doc. 33-3, at 22-26).   York testified during his deposition that he suffered broken ribs, a busted bottom right lip, and injuries to the back of head and top left forehead.   (*Id.* at 26).[4]   He also testified Williams has beaten him in the back of a squad car each night since officers apprehended him in the dance studio. (*Id.* at 14).

Officers returned York to the Sheriff's Office and placed him in a conference room, where he waited until officers transferred him to the Chief Investigator's office for an interview by Sheriff's Investigators Chris Waldrep and Brian Covington.   (Doc. 33-9, ¶ 19; Doc. 33-3, at 31).   York also testified that after officers returned him to the Sheriff's Office, Owens put a hat on him, slapped him, punched him in his face, took pictures of him, and stuffed fruit in his mouth.   (*Id.* at 27).   As a result, York suffered a bloody nose and humiliation.   (*Id.* at 27-28).   York also testified officers urinated on him at some unspecified

---

[4] York testified a Limestone County Jail officer obtained Snapchat footage of Williams beating him with handcuffs in the back of the police vehicle, but he has not produced such evidence.   (Doc. 33-3, at 9).   Nor has York produced any other photos of the beating he alleges exist.

point, and they detained him in the conference room so long that he urinated in a chair.   (*Id.* at 30, 32).

During the recorded portions of the interview, York sat in a chair with his hands handcuffed behind his back.   York told the investigators his ribs and the back of his head were "messed up" "pretty bad," though his ribs, which were "killing" him, hurt the most.   He claimed the injury to his head "happened from an officer," when officers placed him in the police vehicle, not from his fall over the fence.   However, in contrast to his deposition testimony, he refused to identify the officer who hit him, or to specify whether the officer served as a Sheriff's Deputy or municipal officer.   He also claimed he suffered a four-inch gash on his leg.   He responded affirmatively when officers asked if the rib injury occurred when he fell on the air-conditioning unit after scaling the fence.   (Doc. 33-2, at 08:13-09:18, 13:32-13:45, 14:54-15:08, 19:41-43).

The video does not depict York demonstrating obvious signs of significant pain, distress, or difficulty breathing or speaking.   However, York takes some actions that could signify some level of discomfort.   On one occasion, he bends forward and takes a deep breath, revealing a red, bloody spot on the back of his head. (*Id.* at 09:55-59).   After lamenting how much his actions might cost in legal fees, he furrows his brow and grimaces.   (*Id.* at 10:11-10:40).   He clears his throat twice.   (*Id.* at 11:14-11:15, 13:03-13:07).   On one occasion, he leans forward and grunts, causing a slight pause in his speech. (*Id.* at 15:58-16:03). The left side of York's face does not contain any visible injuries, but the video exhibits possible swelling and bruising under York's right eye, and redness in that same eye.   (*Id.* at 01:37-

11

01:38, 04:08-04:10, 04:51-04:55, 05:21, 06:11-06:13, 09:30, 09:46-09:49, 10:05-10:12, 11:00-11:46, 12:34, 13:24-13:26, 16:11-16:25, 16:34-16:42, 19:32-19:34, 19:41-19:44).   At one point, the interviewer, off camera, asks York whether the spot on his head and "this right here" happened the day of the interview, indicating the interviewer referenced another part of York's body that sustained an injury. (Doc. 33-2, at 14:55-15:10).   York also remarked that he received the injuries to his ribs and his leg during his jail escape the previous day, and he responded negatively as to whether he received any head injuries from scaling the jail's fence. (*Id.*).

York testified that, after removing him from the conference room, officers placed him in cell 108 near the booking area, stripped him of all his clothes, provided him a wet mattress that smelled like urine, and turned on the air conditioner.   York remained in the cold cell three days, and he could sleep only while balled up in the fetal position on his side.   Officers refused to provide him medical treatment, and York refused to eat.   After three days, York stood and beat on the door, and a QCHC nurse took him to the medical department for examination.   York told the nurse he could not breathe.   The nurse examined York and determined he likely suffered a pneumothorax.   Officers immediately transported York to the nearest hospital, where doctors determined he needed transfer to a different hospital to undergo a corrective procedure.   (Doc. 33-3, at 5, 32-37).

In contrast to York's testimony, QCHC records reveal York refused medical assessment or treatment on October 28, 2019.   (Doc. 33-5, at 5; Doc. 33-9, ¶ 22(a)).   QCHC records confirm that at 8:00 a.m. on October 30, York knocked on the window of his cell complaining

of shortness of breath.   (Doc. 33-5, at 5; Doc. 33-9, ¶ 22(b)).   The on-site nurse contacted the doctor on call, who ordered a chest x-ray and antibiotics at 9:00 a.m.   (Doc. 33-5, at 5-6; Doc. 33-9, ¶ 22(c)).   A radiologist at TridentCare Imaging read the chest x-ray at 12:52 on October 30, and concluded York suffered a left pneumothorax.   At 1:12 p.m., TridentCare faxed a copy of the radiology report to QCHC.   (Doc. 33-5, at 7; Doc. 33-9, ¶ 22(d)).   The QCHC nurse reported the x-ray results to the on-call physician, who ordered York to the emergency room for further evaluation.   (Doc. 33-5, at 5; Doc. 33-9, ¶ 22(e)).[5]

Officers transported York to the emergency room at Lawrence Medical Center in Moulton, but that facility transferred him to North Alabama Medical Center, which admitted him at 4:45 p.m. on October 30, 2019.   (Doc. 33-5, at 9; Doc. 33-9, ¶¶ 22(f)-(g)).   York's records from the North Alabama Medical Center confirm x-rays revealed a left-side pneumothorax and left rib fractures.   The records state York sustained the injuries to his left side when he fell on an air conditioning unit during his escape.   (Doc. 33-5, at 9, 12). Doctors inserted a chest tube on October 31, 2019, and they removed it on November 2, 2019.   On November 3, 2019, the hospital discharged York to the jail in stable condition. (*Id.* at 9-13).   After York's discharge, QCHC medical staff managed his medical care.   (Doc. 33-9, ¶ 22(h)).

---

[5] The record does not clearly reflect the time at which this communication occurred.   Defendant's brief and Williams's declaration state the nurse communicated the results to the doctor at 2:00 p.m. on October 30. (Doc. 34, ¶ 46; Doc. 33-9, ¶ 22(e)).   But the notes themselves state the following at October 28, 2019, at 1300 hours:   "Received results from xray. See report.   Called MD on call, orders to send to ER for further evaluation."   (Doc. 33-5, at 5).   As the nurse did not first examine York until October 30, 2019, she could not have received the x-ray results on October 28.   Thus, the court presumes the notes' reference to October 28 represents a typographical error.

## DISCUSSION

Williams and Sanders argue qualified immunity shields them from liability for York's respective § 1983 claims for excessive force and deliberate indifference to serious medical needs.   Qualified immunity protects government officials performing discretionary functions in their individual capacities from civil suit and liability "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"When a court concludes [an official] was engaged in a discretionary function, 'the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity.'" *Hill*, 797 F.3d at 978 (emphasis in original) (citation omitted).   There exists no dispute Williams and Sanders performed discretionary functions in these circumstances, so York bears the burden of persuading the court Williams and Sanders should not enjoy immunity.   "To defeat qualified immunity, '(1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct.'" *Carruth v. Bentley*, 942 F.3d 1047, 1054 (11th Cir. 2019) (quoting *Taylor v. Hughes*, 920 F.3d 729, 732 (11th Cir. 2019)).   Courts retain discretion to adjudicate one prong without addressing the other.   *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

I.      **Williams Cannot Receive Qualified Immunity on York's Excessive Force Claim, as Material Fact Disputes Persist Regarding Whether Williams Beat York After York Was Subdued**

York asserts Williams "used unnecessary and excessive force when he repeatedly struck [York] across his head and person as he sat handcuffed and defenseless in the back seat of the police car," and those actions "deprived [York] of his fundamental interest in being secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment of the United States Constitution, as applied to state actors by the Fourteenth Amendment."   (Doc. 1, ¶¶ 38, 40; *see also id.* ¶ 42 ("Defendant Williams' actions on or about October 28, 2019, violated the rights of Plaintiff secured by the Fourth and Fourteenth Amendments of the U.S. Constitution.")).   Defendants also characterize York's claims as falling under the Fourth Amendment.   (Doc. 34, at 18 ("The test for determining whether officers' use of force was constitutionally excessive is the 'objective reasonableness' standard of the Fourth Amendment.")).   However, the court concludes the Fourteenth Amendment, not the Fourth Amendment, may govern York's excessive force claim.

According to the Eleventh Circuit, the Fourth Amendment

secures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The prohibition against "unreasonable . . . seizures" encompasses a bar on the use of excessive force in the course of an arrest. *See Graham*[ *v. Connor*], 490 U.S. [386,] 394[ (1989)]; *Piazza*[ *v. Jefferson Cnty.*], 923 F.3d [947,] 952[ (11ᵗʰ Cir. 2019)].   The Eighth Amendment forbids the infliction of "cruel and unusual punishments," U.S. const. amend. VIII, and the Supreme Court has interpreted it to prohibit the use of excessive force against convicted prisoners. *See Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).   The Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of law," U.S. const. amend. XIV,

and the Court has construed those terms to forbid the use of excessive force, too. *See Kingsley v. Hendrickson*, 576 U.S. 389, 393, 135 S. Ct. 2466, 192 L.Ed.2d 416 (2015).   So, under the Supreme Court's current framework, the Fourth Amendment covers arrestees, the Eighth Amendment covers prisoners, and the Fourteenth Amendment covers "those who exist in the in-between — pretrial detainees." *Piazza*, 923 F.3d at 952.

*Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021), *cert. denied*, 211 L. Ed. 2d 522, 142 S. Ct. 845 (2022) (ellipses and first alteration in original).

The record does not explicitly identify York as a convicted inmate, arrestee, or pretrial detainee.   The October 19, 2021, Complaint states York "is presently in the custody of the Alabama Department of Corrections," but at the time of the relevant events, he "was an inmate at the Lawrence County Jail located in Moulton, Alabama."   (Doc. 1, ¶ 1).   Within the context of York's claim for deliberate indifference to serious medical needs, he cites the Fourteenth Amendment's requirement that corrections officers "provide for the reasonable health and safety of persons in pretrial custody."   (*Id.* ¶ 45).   As discussed, York did not file a summary judgment brief, but Defendants' brief states "York was booked into the Lawrence County Detention Center" on September 23, 2019, just over a month before he attempted to escape.   (Doc. 34, at 2, ¶ 1).   Jail records confirm the September 23, 2019, booking date. (Doc. 33-4, at 2).   Jail records also reflect warrants issued for York on September 23, 2019, for attempting to elude police, unlawful possession of a controlled substance, reckless endangerment, theft of property 2nd, and burglary 3rd.   Warrants issued on September 24, 2019, for theft of property 3rd and burglary 3rd.   A new warrant issued on October 28, 2019, for escape 3rd.   (*Id.* at 10).   York did not leave the jail for trial or other court appearances at

16

any time prior to his escape.   (*Id.* at 12).   Finally, the court takes judicial notice of York's state court criminal records, which depict York pleaded guilty on February 9, 2022, to two counts of burglary 3rd, one count of receiving stolen property 1st, one count of escape 3rd, and one count of criminal trespass 2nd.   (Judgment and Entry of Sentence, *Alabama v. York*, No. 42-CC-2020-000110.00 (Lawrence Co. Circuit Ct. Feb. 14, 2022)).

These documents indicate York did not receive a conviction or other final judgment prior to his October 28, 2019, escape; therefore, the Eighth Amendment "cruel and unusual punishment" standard does not apply.   The circumstances strongly indicate York fell under the category of a pretrial detainee, as it appears the Lawrence County Detention Center housed him while he awaited disposition of his criminal charges.   However, the court cannot definitively make that determination.   "The Supreme Court long ago described a pretrial detainee as a person who had received a judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Crocker*, 995 F.3d at 1247 (cleaned up) (citing *Bell v. Wolfish*, 441 U.S. 520, 536 (1979); *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)).   "[T]he line – for excessive-force purposes – between an arrestee and a pretrial detainee isn't always clear;" thus, "[f]or someone who could plausibly be characterized as either an arrestee or a pretrial detainee, it's hard to say whether the Fourth or Fourteenth Amendment should govern the analysis." *Id.* (citing *Hicks v. Moore*, 422 F.3d 1246, 1254 n.7 (11th Cir. 2005)).   The record does not definitively indicate whether York received a judicial determination of probable cause prior to his escape, though, as discussed, the circumstances

17

indicated he likely did.[6]

Though York likely was a pretrial detainee on the date of his escape, the excessive force standard would not change if he persisted as an arrestee.   As the Eleventh Circuit has observed, "'the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment.'" *Id.* at 1252 (quoting *Piazza*, 923 F.3d at 953); *see also id.* at 1247 ("Whether framed in terms of the Fourth or Fourteenth Amendment, Crocker's claim fails."); *Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1182 (11th Cir. 2020) ("After *Kingsley*, the Fourteenth Amendment's standard is analogous to

---

[6] York's escape did not change either his status as a pretrial detainee or the law governing his excessive force claim.   The Eleventh Circuit has not explicitly addressed the appropriate law governing a re-captured escapee's excessive force claim. *See Wright v. Whiddon*, 951 F.2d 297, 300-01 (11th Cir. 1992) (acknowledging the standard remained unresolved but declining to resolve the discrepancy as the officers enjoyed qualified immunity).   However, the Ninth and Sixth Circuits have held that the Eighth Amendment governs an escaped convict's excessive force claim.   According to the Ninth Circuit, "the Eighth Amendment applies equally to convicted prisoners inside or outside the walls of the penal institution . . . as 'the State has complied with the constitutional guarantees traditionally associated with criminal prosecution.'" *Hughes v. Rodriguez*, 31 F.4th 1211, 1221 (9th Cir. 2022) (quoting *Whitley v. Albers*, 475 U.S. 312, 318 (1986)).   As the Sixth Circuit explained, "[t]he use of excessive force to recapture an escaped convict creates a different problem than the use of force to apprehend a nonviolent fleeing felony suspect.   Attempts at recapture do not trigger the Fourth Amendment anew because the convict has already been 'seized,' tried, convicted, and incarcerated." *Gravely v. Madden*, 142 F.3d 345, 348 (6th Cir. 1998); *see also Aleman v. Riverside Cnty. Sheriff's Dep't*, No. EDCV 22-269-CJC (KK), 2022 WL 17742550, at *3 n.3 (C.D. Cal. Nov. 15, 2022), *report and recommendation adopted*, No. EDCV 22-269-CJC (KK), 2022 WL 17738714 (C.D. Cal. Dec. 16, 2022) (applying Eighth Amendment to excessive force claim by convict escapee); *Green v. Poorman*, No. CV 20-85-SRF, 2022 WL 2527079, at *7 (D. Del. July 7, 2022) (same); *Parker v. Henline*, No. 2:17-CV-753-KFP, 2020 WL 6581973, at *10 (M.D. Ala. Nov. 10, 2020) (same); *Foster v. Carroll Cnty., Miss.*, No. 4:09CV127-SA-JAD, 2011 WL 4386412, at *2 (N.D. Miss. June 23, 2011), *report and recommendation adopted sub nom. Foster v. Carroll Cnty.*, No. 4:09CV127-A-S, 2011 WL 4389210 (N.D. Miss. Sept. 20, 2011) (same).

   The same reasoning that supports the continued application of the Eighth Amendment to a convicted inmate's excessive force claims after an escape also supports the continued application of the Fourteenth Amendment to a pretrial detainee's post-escape excessive force claim.   As a pretrial detainee, York had not received the constitutional protection of the full criminal process, yet he had already been "seized" pursuant to the Fourth Amendment prior to his detainment at the Lawrence County Detention Center.   Thus, York's claim proceeds under the umbrella of the Fourteenth Amendment and the framework of the Supreme Court's *Kingsley* decision.

the Fourth Amendment's."). Moreover, regardless of the Constitutional amendment under which the claim proceeds, Defendants may claim qualified immunity. *See id.* at 1181 ("Patel's two Fourteenth Amendment claims – alleging excessive force and deliberate indifference to a serious medical need – are both subject to the doctrine of qualified immunity, which bars many damages actions against government officials."); *Corbitt v. Vickers*, 929 F.3d 1304, 1315 (11th Cir. 2019) (considering qualified immunity from a Fourth Amendment excessive force claim).

Pursuant to the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), a pretrial detainee pressing an excessive force claim "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-97.

> A court (judge or jury) cannot apply this standard mechanically. See [*Cnty. of Sacramento v.*] *Lewis,* [523 U.S. 833,] 850[ (1998)]. Rather, objective reasonableness turns on the "facts and circumstances of each particular case." *Graham v. Connor,* 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. See *ibid.* A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 540, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).

*Id.* at 397 (last two alterations in original). The assessment may entail consideration of the following factors: (1) "the relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) the officer's efforts "to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) the threat the officer reasonably perceives; and (6) "whether the plaintiff was actively resisting." *Id.*

(citing *Graham*, 490 U.S. at 396).

"'Once a prisoner has *stopped resisting* there is no longer a need for force, so the use of force thereafter is disproportionate to the need.'" *Piazza,* 923 F.3d at 953 (emphasis in original) (quoting *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) (emphasis added), *abrogated on other grounds by Kingsley*, 135 S. Ct. 2466); *see also Lucibella v. Town of Ocean Ridge*, No. 22-11056, 2023 WL 2822126, at *7 (11th Cir. Apr. 7, 2023) (citing *Patel*, 959 F.3d at 1339) ("We have held that an officer violates the Fourth Amendment and is denied qualified immunity when he uses 'gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands.'").   The continued use of force under such circumstances constitutes a clearly established Fourteenth Amendment violation.   *Piazza,* 923 F.3d at 955 (quoting *Danley*, 540 F.3d at 1309) ("It was more than ten years ago now that this Court held, in no uncertain terms, that '[w]hen jailers continue to use substantial force against a prisoner who has clearly stopped resisting – whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated – that use of force is excessive.'" (alteration in original)).

York testified Williams taunted and beat him while he sat handcuffed, subdued, and compliant in the back seat of a police vehicle.   That testimony provides an evidentiary basis for York's excessive force claim against Williams, yet Williams argues video evidence of York's post-capture interview so obviously contradicts York's testimony that no reasonable jury could believe York's version of facts.

"When opposing parties tell two different stories, one of which is blatantly contradicted

by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."   *Scott v. Harris*, 550 U.S. 372, 380 (2007).   When video evidence "'obviously contradicts the nonmovant's version of the facts,'" the court must "'accept the video's depiction instead of the nonmovant's account and view the facts in the light depicted by the videotape.'"   *Baxter v. Roberts*, 54 F.4th 1241, 1253 (11th Cir. 2022) (quoting *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018)).

Williams argues the interview video depicts a "noticeable lack of injury" to York's face and head, as York "was not bleeding from the face and head . . . did not have any gashes in his face or head . . . [n]or did [he] have a busted lip, nose, or forehead."   (Doc. 34, at 20). Indeed, the video does not depict York bleeding from gashes on his face or displaying a busted nose or lip.   However, the video depicts possible swelling and bruising under York's right eye, redness in that same eye, and a red, bloody mark on the back of his head.   And the interviewer referenced York's injuries as the mark on his head and another manifestation, in addition to the gash on his leg and the rib soreness.   Those physical markings support York's version of events.   Moreover, York need not drastically bleed from large gashes in his skin or display grotesque swelling or bruising to support a valid excessive force claim, as the use of *any* force after officers subdued him in handcuffs in the back of a police vehicle and secured his compliance would constitute excessive force in violation of the Fourteenth Amendment. *See Charles v. Johnson*, 18 F.4th 686, 700 (11th Cir. 2021) (citing *Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 n.33 (11th Cir. 2017); *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014)) ("A plaintiff who suffers only *de minimis* injury does not necessarily lack a claim for excessive force

21

under § 1983.").

Williams also argues "York's breathing neither appears labored nor does he complain about any difficulty breathing." (*Id.*).   The court agrees with the factual accuracy of Williams's statement, as the video does not depict a breath pattern the court would characterize as labored, and it does not depict York complaining about breathing problems.   Even so, the absence of complaints or labored breathing does not conclusively demonstrate York did not suffer the alleged assault by Williams.

As an initial matter, the video depicts York displaying some signs of discomfort potentially related to his lungs or breath, including leaning forward to take a deep breath, clearing his throat, furrowing his brow, grimacing, and grunting and pausing his speech while leaning forward.   While those actions may not depict an injury that significantly impacted York's breathing or prevented him from speaking, they do provide factual support for York's testimony that Williams beat him on his body.   Again, the use of *any* force after subduing an individual in handcuffs in a police vehicle and securing his compliance would exceed the bounds of the Fourteenth Amendment.

More significantly, x-rays taken days after York's escape revealed York suffered a left pneumothorax and fractured ribs, and Defendants do not dispute the existence of those injuries.   (*See id.* at 10-11).   The origin of the injuries remains in dispute, as Defendants claim York injured his ribs when he fell over the fence during the escape, yet York testified during his deposition that he fell on a fishing pole, then that he sustained the injuries when Williams and other officers beat him in the back of the police vehicle.   York also suggested that during

his post-capture interview, investigators coerced him into stating the rib injuries resulted from the fall, and he argues an individual with broken ribs and a punctured lung could not have run into the woods and then to the dance studio.   These circumstances present genuine disputes as to a material fact – i.e., whether York sustained the rib injuries and a punctured lung during a fall from a fence or during a beating by Williams while he sat subdued, handcuffed, and compliant in the back of a police vehicle.

For some readers, the contradictory and implausible nature of York's testimony may strain the bounds of credibility.   York told officers after his capture that he broke his ribs when he fell over the fence, but he testified during his deposition that he broke his ribs falling on a fishing pole.   He also testified he used a fishing pole with minnow bait to open the cell block door; Williams allowed him to escape after he called Williams from Defendants' attorney's cell phone; Peter Pan helped him over the fence and took him to Never Never Land; and Williams floated with him in the clouds.   He testified Williams has beaten him in the back of a squad car every night since his capture, yet he no longer resides in Williams's facility.   He also testified he suffered a busted lip and head, but as discussed, the video evidence does not completely bear that out.   During his deposition, he identified Williams as the officer who hit him in the head, but during the post-capture interview, he declined to identify the officer.

As discussed, the court must normally refrain from assessing credibility at the summary judgment stage.   *See Reeves*, 530 U.S. at 150; *Anderson,* 477 U.S. at 255.   The Second Circuit recognizes "a narrow exception" to that "bedrock" rule when "the plaintiff relies almost

exclusively on his own testimony, much of which is contradictory and incomplete." *Frost v. New York City Police Dep't*, 980 F.3d 231, 245 (2nd Cir. 2020) (citing *Agosto v. INS*, 436 U.S. 748, 756 (1978); *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2nd Cir. 2005)).   "In such an extraordinary case," the Second Circuit considers it "'impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account.'" *Frost,* 980 F.3d at 245 (quoting *Jeffreys,* 426 F.3d at 554).   When "'[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [the] complaint,'" the court may grant summary judgment.   *Jeffreys,* 426 F.3d at 555 (citing *Schmidt v. Tremmel,* No. 93 CIV. 8588 (JSM), 1995 WL 6250, *3 (S.D.N.Y. Jan. 6, 1995)) (alterations in original).

However, the Eleventh Circuit has not explicitly endorsed the Second Circuit's reasoning, and even if it did, the circumstances presented here do not mirror those the Second Circuit encountered.   In *Jeffreys v. City of New York*, 426 F.3d 549 (2nd Cir. 2005), the Second Circuit upheld the district court's grant of summary judgment on Jeffreys's claim that police officers assaulted him during an arrest for entering and looting a public school building.   *Id.* at 550-51, 555.   Material fact disputes included:

> (1) whether Jeffreys jumped, fell, or was thrown by the police out of a third-story school classroom window, (2) whether Jeffreys was struck in the head with a flashlight by one or more police officers while still inside the school classroom, and (3) whether Jeffreys was otherwise physically assaulted by one or more police officers, either before or after his alleged defenestration.

*Id.* at 554.   Jeffreys attested an officer beat him with a flashlight after he surrendered, then other officers joined in the beating, causing him to lose consciousness and awaken on the sidewalk below a third-story window.   He did not remember jumping or falling from the window, so he inferred one of the officers must have pushed or thrown him.   *Id.* at 551. Jeffreys also presented statements from his aunt and the mother of his son recounting his prior statements that officers threw him out of the window.   *Id.* at 552.

Countering Jeffreys's self-serving statements, the record contained the following evidence:   (1) Jeffreys's three previous confessions to medical and police personnel that he jumped out the window; (2) Jeffreys's failure to allege officers mistreated him until nine months after the alleged incident; (3) Jeffreys's inability to provide details about the alleged assault, such as the number of officers involved or any of their defining features; and (4) testimony from emergency medical personnel immediately after the fall that Jeffreys did not lose consciousness and did not suffer any head trauma consistent with beating by a flashlight. *Id.* at 552-53.   The Second Circuit agreed with the district court that no *genuine* issues of material fact existed, as "nothing in the record . . . support[ed] plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and 'no reasonable person could believe Jeffreys'[s] testimony.'"   *Id.* at 554-55 (second alteration in original).

The Second Circuit relied in part upon *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460 (S.D. N.Y. 1998), a district court opinion by then-Judge Sotomayor.   In the circumstances of that decision, "[f]rom the complaint, to plaintiff's deposition, to his opposition papers to defendants' summary judgment motion, plaintiff's allegations of the events at issue [were]

replete with inconsistent and contradictory statements. *Id.* at 470.   Judge Sotomayor rejected the plaintiff's inconsistent, contradictory statements because he offered no explanation for the inconsistencies.   *Id.*   Judge Sotomayor also concluded the plaintiff's factual allegations, which were "so contradictory that doubt is cast upon their plausibility," authorized her to "'pierce the veil of the complaint's factual allegations,' dispose of '[s]ome improbable allegations,' and dismiss the claim." *Id.*

The depth of contradiction and the absence of evidence – other than the plaintiff's self-serving testimony – essentially supported these decisions' application of the narrow exception to the rule against evaluating credibility during summary judgment.   In other cases, where corroborating evidence existed, or where plausible explanations tempered inconsistencies in salient testimony, the Second Circuit has declined to apply the exception.

In *Fischl v. Armitage*, 128 F.3d 50 (2nd Cir. 1997), which the *Jeffreys* opinion cited, the district court questioned whether the plaintiff suffered an attack because his accounts of the event contained inconsistencies, he failed to report the attack to prison workers, and no prison workers noticed his injuries.   However, contemporaneous photographs and medical records corroborated the plaintiff's account of events, and the Second Circuit overturned the district court's grant of summary judgment, as the district court should have accepted the plaintiff's account of events as true.   *Id.* at 56; *see also Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 22-23 (2nd Cir. 2014) (district court should not have evaluated the credibility of the plaintiff's testimony during summary judgment proceedings, as the testimony did not contain direct contradictions, and other independent evidence corroborated the testimony).

In *Frost v. New York City Police Dep't*, 980 F.3d 231 (2nd Cir. 2020), Frost, who received a conviction for murder, asserted officers violated his due process rights by creating false evidence against him.   *Id.* at 237, 244.   A witness stated on the day of the murder that he did not know who fired the fatal shots or the shots' direction of origin, then later he said the shots originated from a stairwell, and he described an individual standing in the doorway of the stairwell at the time of the shooting.   However, six months later, in an effort to cooperate with authorities on new charges he faced, the witness identified Frost as the shooter.   *Id.* at 238-39.   The witness changed his story yet again during the civil proceedings, which occurred seven years after the murder investigation, when he submitted a declaration stating he previously falsely identified Frost to help himself.   *Id.* at 240.   The district court discredited the witness's declaration for its inconsistencies and implausibilities, and it granted summary judgment for the defendants on Frost's claim that authorities manufactured evidence against him.

The Second Circuit found the district court erred, as the narrow exception employed in *Jeffreys* did not extend to the circumstances presented.   A plausible explanation existed for the variation in the witness's accounts:   he lied to make a deal with authorities, then later changed his mind and decided to tell the truth.   The testimony did not contain any other material contradictions, and concerns that the witness's testimony would raise issues of attorney misconduct did not present implausibilities.   *Id.* at 245-48; *see also Bentley v. AutoZoners, LLC*, 935 F.3d 76, 87 (2nd Cir. 2019) ("[O]n summary judgment, a court should not disregard testimony if there is a plausible explanation for its contradiction by other evidence."); *compare*

*Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 106 (2nd Cir. 2011) (excluding plaintiff's testimony as inconsistent when the court provided plaintiff and her counsel multiple opportunities to explain or reconcile the contradictions, but they did not do so).

In the present case, no reasonable juror would credit York's testimony that he broke his ribs by falling on a fishing pole, used a fishing pole to escape, received assistance from Williams and Peter Pan, floated in the clouds with Williams, or received a beating from Williams every night since his escape.   However, a plausible explanation exists for those fanciful statements:   Defendant's attorney angered York during the deposition (ostensibly from the outset vis-à-vis questions about certain aspects of York's prison disciplinary history), and correspondingly, York intentionally provided provocative and evasive testimony.   If jurors hear York's statements during trial, they may draw conclusions about York's credibility, but the court must not draw those conclusions at summary judgment.   *C.f., Cooper v. Georgia Dep't of Transportation*, 837 F. App'x 657, 665 (11th Cir. 2020) ("Under the "sham affidavit" rule, a court may disregard an affidavit if it flatly contradicts, without any explanation, clear testimony that the party provided at an earlier deposition. *See Van T. Junkins & Assoc., Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).   This rule applies only to inherent, unexplained inconsistencies that create "transparent shams," not to discrepancies that merely create an issue of credibility or that go to the weight of the evidence. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986).").

A plausible explanation also exists for York's reluctance during his post-capture interview to identify Williams as the officer who hit him in the head.   At that time, he

remained under Williams's custody, and he may have hesitated to implicate Williams for fear of incurring additional violence.   Moreover, though the video evidence does not completely support York's statements that he suffered a busted lip and head, the video at least partially corroborates York's testimony by depicting a mark on his head and apparent bruising regarding his right eye.   The video also depicts York informing an unidentified investigator an injury on his head resulted "from an officer," and the investigator subsequently acknowledging the injury. (Doc. 33-2, at 08:18-08:58, 14:53-15:00).   Therefore, York's contradictory, self-serving testimony that Williams assaulted him does not constitute the only evidence supporting his allegations.

For these reasons, the facts do not warrant application of the narrow exception to the rule that the court must credit the non-moving party's version of events when considering a motion for summary judgment.   As York has presented evidence plausibly supporting his assertions that Williams beat him on the head and body after he sat handcuffed, subdued, and compliant in the back seat of a police vehicle, he has supported a clearly established excessive force violation.   The court must deny Williams's motion for summary judgment on York's excessive force claim.

## II.    Sanders Enjoys Qualified Immunity from York's Claim for Deliberate Indifference to Serious Medical Needs, as No Evidence Exists Sanders Actually, Personally Knew York Suffered a Substantial Risk of Serious Harm, and No Basis Exists for Imposing Supervisory Liability

York's Complaint asserts Sanders observed his injuries after officers returned him to the Detention Center after his escape, and Sanders knew York experienced trouble breathing,

29

yet Sanders deliberately disregarded York's cries for help and his obvious need for medical

care by placing York in a holding cell for three days and directing subordinates to disregard

York's pleas for assistance.    (Doc. 1, ¶¶ 46-51).[7]

The Fourteenth Amendment protects pretrial detainees from corrections officers'

deliberate indifference to their serious medical needs.    *Gilmore v. Hodges*, 738 F.3d 266, 271

---

[7] In more detail, York alleges:

46.  Plaintiff was visibly bleeding from both his head and face when he arrived at the Lawrence County Sheriff's Department and when Defendant Sanders entered the conference room where Plaintiff sat.

47.  After experiencing violent blows to his head and body delivered by Defendant Williams, Plaintiff warned Defendant Sanders that he felt that he was about to have a seizure.   He also repetitively exclaimed that he was having trouble breathing, making his need for immediate medical assistance obvious – even to a lay person.

48.  Despite this obvious need for medical care, Defendant Sanders disregarded Plaintiff's pleas for help.   Instead, Defendant Sheriff Sanders, who was the highest ranking official present, demanded that Plaintiff be placed in a holding cell until he instructed otherwise.

49.  Defendant Sanders directed his subordinates to act unlawfully and disregard Plaintiff's pleas for medical assistance, depriving Plaintiff of his Fourth and Fourteenth Amendment rights.

50.  As a result of Sanders' deliberate indifference to Plaintiff's serious medical need, Plaintiff laid on the floor of a holding cell for approximately three days in excruciating pain.

51.  Defendant Sanders' disregard of Plaintiff's medical needs exacerbated Plaintiff's injuries.

(Doc. 1, ¶¶ 46-51).   However, as York did not attest to or verify the allegations of his Complaint, he cannot rely upon those allegations to survive Defendants' motion for summary judgment.   *See Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)) ("[P]leadings are only allegations, and allegations are not evidence of the truth of what is alleged. Wright, as the nonmovant, was required to go beyond the pleadings in her own case and present competent evidence in the form of affidavits, depositions, admissions, and the like to show a genuine issue for trial."); *Avery Properties LLC v. Scottsdale Ins. Co.*, No. 22-23860-CIV, 2023 WL 1992038, at *2 (S.D. Fla. Feb. 14, 2023) (citation omitted) ("Allegations within a complaint are not evidence."); *Wimberly v. Horne*, No. 5:21-CV-25, 2023 WL 2333920, at *5 (S.D. Ga. Feb. 6, 2023), *report and recommendation adopted*, No. 5:21-CV-25, 2023 WL 2333909 (S.D. Ga. Mar. 2, 2023) (citations omitted) (court could not consider allegations from an unsworn complaint in resolving a motion for summary judgment).

(11th Cir. 2013) (citing *Lancaster v. Monroe Cnty.,* 116 F.3d 1419, 1425 n. 6 (11th Cir. 1997),

*overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009)) ("Pretrial

detainees [asserting claims for deliberate indifference to serious medical needs] must proceed

under the Due Process Clause of the Fourteenth Amendment.").[8]   The qualified immunity

analysis applies to York's deliberate indifference claim, as it did to his excessive force claim.

*Myrick v. Fulton Cnty.,* - F.4th - , No. 22-10441, 2023 WL 3860263, at *15 (11th Cir. June 7, 2023)

("This [deliberate indifference] claim, like the excessive force claims discussed above, is subject

---

[8] So long as pretrial detention conditions of confinement and restrictions have a "legitimate governmental objective" and are not imposed for the purpose of punishment, the Fourteenth Amendment is not violated. *Grochowski v. Clayton Cty., Georgia through Turner*, 961 F.3d 1311, 1318 n.3 (11th Cir. 2020), *cert. denied sub nom. Grochowski v. Clayton Cty., Georgia*, 141 S. Ct. 1269, 209 L. Ed. 2d 9 (2021).   Thus, Sanders violated the Fourteenth Amendment if his conduct lacked a legitimate governmental objective and only imposed punitive consequences.

However, circuit precedent obligates application of the Eighth Amendment conditions-of-confinement standard:

> When analyzing claims under the Due Process Clause, the Eleventh Circuit often refers to precedent under the Eighth Amendment's Cruel and Unusual Punishment Clause. *Keith v. DeKalb Cty.,* 749 F.3d 1034, 1044 n.35 (11th Cir. 2014) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983)); *see also Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).   The Eleventh Circuit has thus recognized that "[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment." *Keith*, 749 F.3d at 1047 (alteration incorporated) (quoting *Marsh v. Butler Cty.,* 268 F.3d 1014, 1028 (11th Cir. 2001) (*en banc*), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

*Grochowski*, 961 F.3d at 1318 (alteration in original).

Stated differently, courts predominantly apply Eighth Amendment standards to Fourteenth Amendment cases in this context: if an official subjects a pretrial detainee to cruel and unusual punishment pursuant to Eighth Amendment standards, the official also has inflicted punitive conditions lacking a legitimate governmental objective under the Fourteenth Amendment.   *See Myrick v. Fulton Cnty., Georgia*, 69 F.4th 1277, 1304-05 (11th Cir. 2023) (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007)) ("Deliberate indifference claims made under the Fourteenth Amendment are held to the same standards as deliberate indifference claims made under the Eighth Amendment.").

to the same two-step qualified immunity analysis.").    Thus, for the deliberate indifference claim to survive summary judgment, York must present evidence that Sanders violated his clearly established right not to experience deliberate indifference to serious medical needs.

"A claim of deliberate indifference to serious medical needs includes both an objective and subjective component."    *Id.* at *15 (citing *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020)).    First, York must demonstrate he experienced an objectively serious medical need – i.e., "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, . . . and, in either instance, 'that, if left unattended, poses a substantial risk of serious harm."' *Patel*, 969 F.3d at 1188 (citing *Taylor*, 920 F.3d at 733); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009)).    Second, York must demonstrate Sanders acted with subjective deliberate indifference to his serious medical need.    *Myrick*, 2023 WL 3860263, at *15.    He may do so by presenting evidence that Sanders "(1) ha[d] subjective knowledge of a risk of serious harm; (2) disregarde[d] that risk; and (3) act[ed] with more than gross negligence."    *Id.* (citing *Patel*, 969 F.3d at 1188).    Third, York must demonstrate Sanders's deliberate indifference caused him injury.    *Id.* at *15.

York cannot demonstrate he experienced a serious medical need because of injuries to his head or face.    He did not receive any treatment for a head or facial injury; the video evidence depicts he suffered only a small bloody spot on the back of his head and bruising and swelling of his right eye; and there exists no evidence the blows to his head and face resulted in any medical problems.    As York testified, "I was more worried about my lungs.

My face was nothing." (Doc. 33-3, at 28).

York's rib injuries did result in an objectively serious medical need, as he suffered fractured ribs and a pneumothorax that eventually required insertion of a chest tube. *See Burkins v. Pietrogiacomo*, No. CV SAG-20-3597, 2022 WL 1155873, at *5 (D. Md. Apr. 18, 2022) (characterizing a punctured lung and broken ribs as objectively serious medical needs); *Faulkner v. Dunn*, No. CV 17-0077-WS-MU, 2019 WL 7549210, at *21 (S.D. Ala. Nov. 7, 2019), *report and recommendation adopted*, No. CV 17-0077-JB-MU, 2020 WL 71261 (S.D. Ala. Jan. 7, 2020) (referring to a punctured lung as a serious medical need); *Peterson v. Monroe Cnty.*, No. 12-11460, 2013 WL 8182474, at *7 (E.D. Mich. Dec. 16, 2013), *report and recommendation adopted sub nom. Peterson v. Cnty. of Monroe*, No. 12-CV-11460, 2014 WL 1328205 (E.D. Mich. Mar. 28, 2014) (material fact questions existed regarding characterizing a broken rib and pneumothorax requiring a five-day hospital stay as serious medical needs).

However, York cannot demonstrate Sanders displayed deliberate indifference to the need, as he presents no evidence Sanders possessed subjective knowledge of a risk of serious harm. "Subjective knowledge of the risk requires that the defendant be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Dang by and through Dang v. Sheriff, Seminole Cnty, Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (alterations in original) (quoting *Caldwell v. Warden, FCI Talladega*, 748 F. 3d 1090, 1100 (11th Cir. 2014)).

There exists no evidence Sanders knew any facts suggesting a substantial risk of serious harm to York, or that he actually inferred York faced a substantial risk of serious harm. York

testified Sanders generally "didn't even walk through" the jail, and Sanders "don't care what his officers does [sic]."   (Doc. 33-3, at 5).   After his capture at the dance studio, York testified he heard Sanders's voice over the radio congratulating the other officers on their efforts, indicating Sanders did not personally travel to the studio to join the efforts.   (*Id.* at 15, 22).   York could not see which officers drove him to the Sheriff's office, which officers escorted him from the police vehicle into the meeting room at the Sheriff's office, or which officers escorted him from the meeting room to the booking area within the Detention Center, as his head faced down during those transfers.   (*Id.* at 31-32).

During his deposition, York responded to Defendants' attorney's question about what occurred in the meeting room at the Sheriff's office after the capture by stating:   "They took me over and sat me by the podium.   The sheriff has got the little white hat with the sheriff sticker on it, and they was all shaking hands and showing guns off and:   Congratulations, you caught him.   Y'all did it."   (*Id.* at 31).   From that testimony, a reasonable juror could conclude Sanders personally observed York in the meeting room on the morning of York's capture.   Still, Sanders would not necessarily draw an inference that York suffered a substantial risk of serious harm from merely visually observing York.

As discussed, the interview video, recorded at or near the time Sanders could have observed York, depicts York displaying some discomfort, but no shortness of breath or difficulty speaking.   Therefore, at the time of York's capture, visual observation alone would not have conferred Sanders with awareness of a serious medical need.   *Compare Armendariz v. Dunn*, No. 2:19-CV-1046-MHT-CSC, 2022 WL 19000098, at *7 (M.D. Ala. Dec. 1, 2022),

*report and recommendation adopted*, No. 2:19CV1046-MHT, 2023 WL 2433963 (M.D. Ala. Mar. 9, 2023) (officers lacked subjective knowledge of a risk of serious harm when the plaintiff showed no visible signs of distress and "was conscious and communicative throughout the entire time" officers interviewed him), and *Barreiro v. Delgado*, No. CV 16-22404-CIV, 2018 WL 4054909, at *1 (S.D. Fla. Aug. 24, 2018) (providers did not subjectively perceive a risk of serious harm, though the plaintiff eventually received a diagnosis of pneumothorax, as the plaintiff displayed normal vital signs throughout the observation period), *with Jeffries v. Sullivan*, No. 3:06CV344MCRMD, 2008 WL 703818, at *16 (N.D. Fla. Mar. 12, 2008) (material fact dispute existed regarding jail medical provider's subjective knowledge of a risk of serious harm from a pneumothorax when the plaintiff said he could not breathe, stood with his arms over his head, gasped, panted like a dog, and lost consciousness when the provider attempted to treat him for hyperventilation).

During the interview, York described his rib injuries and reported the pain he experienced.   Those facts could provide notice of a more serious problem, but Williams declared that Sheriff's Investigators Chris Waldrep and Brian Covington, not the Sheriff himself, conducted the interview.   York has not offered any contradictory evidence, and Sanders does not appear on the video.   Moreover, York presents no evidence that he or other officers otherwise informed Sanders of the rib injuries during the first three days following his capture.[9]

---

[9] When the QCHC nurse examined York three days after his capture, she instantly told officers to "get the sheriff," as York likely suffered a pneumothorax and needed an ambulance.   (Doc. 33-3, at 36).   York did

York cannot impute other officers' knowledge of a serious medical need to Sanders, nor can he rely upon the collective knowledge of all officers, as "'[e]ach individual defendant must be judged separately and on the basis of what that person kn[ew].'" *Dang*, 871 F.3d at 1280 (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (second alteration in original)).

Similarly, York may not hold Sanders liable on a theory of supervisory liability. *See Myrick v. Fulton Cnty., Georgia*, 69 F.4th 1277, 1297 (11th Cir. 2023) (citations omitted) ("It is well established in this Circuit that 'supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.'"). Rather, "supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

---

not state whether Sanders personally responded to the nurse's request, or whether other officers arranged for York's transportation to the hospital. However, even if Sanders personally responded, York's Complaint does not include allegations that Sanders displayed deliberate indifference to his serious medical needs on the third day after his capture. Rather, he focuses upon Sanders's failure to address his condition *during* the three days after his capture. Moreover, the undisputed evidence demonstrates York received prompt medical care on this date. The QCHC nurse examined York within an hour of York knocking on his cell door, and she contacted the on-call doctor, who ordered a chest x-ray and antibiotics. Within an hour of receiving the x-ray results, the QCHC nurse contacted the on-call doctor, who sent orders to transport York to the emergency room. The first emergency room referred York to a different hospital, which admitted him approximately two hours and forty-five minutes after the QCHC nurse received the x-ray results. York's Complaint does not include allegations that Sanders displayed deliberate indifference to his serious medical needs on the third day after his capture. Rather, he focuses upon Sanders's failure to address his condition *during* the three days after his capture.

36

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (citing *Cottone*, 326 F.3d at 1360). York presents no evidence of a history of widespread abuse within Sanders's knowledge, a custom or policy resulting in deliberate indifference, a direction that officers act unlawfully,[10] or knowledge that officers would act unlawfully.

As no evidence exists that Sanders actually, personally knew York suffered a substantial risk of serious harm, or that any basis exists for imposing supervisory liability, York cannot hold Sanders liable for violating his clearly established right to not experience an officers' deliberate indifference to his serious medical needs. The court must grant summary judgment in Sanders's favor on York's deliberate indifference claim.

III.    **The Alabama Jailer Act Does Not Confer Sovereign Immunity on Williams from York's State Law Claims for Assault and Battery, as Material Fact Disputes Persist Regarding Whether Williams Violated York's Constitutional Right**

Williams argues the Alabama Jailer Act extends him sovereign immunity from York's state law tort claims for assault and battery. "The State of Alabama is immune from suit, and that sovereign immunity extends to Alabama sheriffs and their deputies 'when [they are] executing their law enforcement duties.'" *Johnson v. Conner*, 754 F.3d 918, 919-20 (11th Cir.

---

[10] The court notes York alleged in his unsworn Complaint that Sanders directed his subordinates to ignore York's pleas for medical attention, but he did not offer proof of that allegation.

2014) (citing *McMillian v. Monroe Cnty., Ala.,* 520 U.S. 781, 793 (1997); Ala. Const. Art. I, § 14; *Ex parte Haralson,* 853 So.2d 928, 932 (Ala. 2003)).   The Alabama Jailer Act also extends that protection to jailers, such as Williams:

> The sheriff has the legal custody and charge of the jail in his or her county and all prisoners committed thereto, except in cases otherwise provided by law. The sheriff may employ persons to carry out his or her duty to operate the jail and supervise the inmates housed therein for whose acts he or she is civilly responsible. Persons so employed by the sheriff shall be acting for and under the direction and supervision of the sheriff and shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law.

Ala. Code § 14-6-1.

Relatedly, Alabama Code § 36-22-3 provides that the sheriff's duties "may be carried out by deputies, reserve deputies, and persons employed as authorized in Section 14-6-1," and any such individual "shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as he or she is acting within the line and scope of his or her duties and is acting in compliance with the law." Ala. Code § 36-22-3(b).

Courts interpret those provisions "to entitle jailers to the same immunity enjoyed by sheriffs and deputies, provided the jailers are acting within the line and scope of their duties and in compliance with the law." *Murdock v. Montgomery Cnty., Alabama*, No. 2:16-CV-444-RAH (WO), 2021 WL 4254862, at *25 (M.D. Ala. Sept. 17, 2021) (citing *Young v. Myhrer*, 243 F. Supp. 3d 1243, 1257-58 (N.D. Ala. 2017)).

Williams's challenged actions occurred within the line and scope of his duties as Jail Administrator, as Williams declared his duties included overseeing the daily operations of the Detention Center and serving as the Detention Center's custodian of records.   (Doc. 33-9, ¶ 2).   However, material fact disputes persist regarding whether Williams undertook his duties "in compliance with the law" vis-à-vis the excessive force claim.

The Alabama Supreme Court has not interpreted the phrase "in compliance with the law."   *See Martin v. Sheriff of Walker Cnty.*, No. 6:19-CV-01534-LSC, 2020 WL 2475813, at *11 (N.D. Ala. May 13, 2020) (citing *Young v. Myhrer*, 651 F. App'x 878, 881-82 (11th Cir. 2016) (per curiam) ("Alabama courts have not explained the full scope of the phrase 'acting in compliance with the law.'"); *Bryant v. Carpenter*, 322 So. 3d 1052, 1057 (Ala. 2020) ("Ultimately, however, we do not have to interpret § 14-6-1 or decide whether it applies.").   Even so, the Eleventh Circuit has held that § 14-6-1 does not "immunize [defendants] from liability under state law if they violated [a plaintiff's] constitutional rights."   *Taylor*, 920 F.3d at 734-35 (citing *Ex parte Rizk*, 791 So.2d 911, 913-14 (Ala. 2000)); *see also Foster v. Maloney*, 785 F. App'x 810, 818-19 (11th Cir. 2019) (citing *Taylor*, 920 F.3d at 734-35) ("[I]n light of our conclusion the amended complaint plausibly alleged the correctional officers violated Foster's constitutional rights by being deliberately indifferent to her serious medical needs, it necessarily follows it similarly alleged they were not 'acting in compliance with the law,' and they 'violated federal or constitutional law.'").

In addition, every Alabama federal district court has interpreted the phrase to convey an officer does not act in compliance with the law when he violates a plaintiff's constitutional

rights.  *See Young*, 243 F. Supp. 3d at 1258 ("[T]his court concludes that § 14-6-1, as amended, provides sovereign immunity to jailers for all state law torts (just like sheriffs and sheriff deputies) so long as those jailers are acting within the line and scope of their duties and they are complying with criminal statutes, civil statutes, and constitutional standards."); *Bozeman v. Cnty. of Elmore*, No. 2:20-CV-640-ECM, 2021 WL 2954004, at *6 (M.D. Ala. July 14, 2021) ("Watkins is not entitled to jailer immunity as to state-law claims at this time, as a plausible allegation of a violation of federal constitutional law means that there is also a plausible allegation that he was not acting in compliance with the law for purposes of immunity."); *Johnson v. Milliner*, 65 F. Supp. 3d 1295, 1305 (S.D. Ala. 2014) (denying § 14-6-1 immunity to officer defendant on a state law claim for assault and battery when genuine issue of material fact existed as to whether the officer used excessive force in violation of the Fourteenth Amendment).

As material fact disputes remain regarding whether Williams used excessive force in violation of the Fourteenth Amendment, Williams cannot receive the protection of § 14-6-1 at this stage, and York's state law claim for assault and battery will survive summary judgment. A jury must decide Williams's entitlement to state immunity, as it must decide his entitlement to qualified immunity under federal law.  *See Murdock*, 2021 WL 4254862, at *25 ("If a jury finds that Robinson and Palmer violated Murdock's constitutional rights by ignoring his written complaints, that jury could reasonably find that these defendants unlawfully detained Murdock, depriving him of personal liberty, and thereby find in Murdock's favor as to his false imprisonment claim.").

## CONCLUSION AND ORDER

In accordance with the foregoing, the court **PARTIALLY GRANTS** Defendants' motion for summary judgment.

As no genuine fact disputes exist as to Sheriff Max Sanders's lack of personal knowledge of a substantial risk of serious harm, or as to Sanders's supervisory liability, the court **GRANTS** summary judgment in Sanders's favor on York's claim for deliberate indifference to serious medical needs in violation of the Fourteenth Amendment and **DISMISSES** Count II of York's Complaint.

As genuine fact disputes exist as to Jail Administrator Jerry Williams's use of force after he York was subdued, the court **DENIES** summary judgment in Williams's favor on York's claim for excessive force in violation of the Fourteenth Amendment.   Count I of York's Complaint will proceed to trial.

As genuine fact disputes exist as to whether Williams violated York's constitutional right, the court **DENIES** summary judgment in Williams's favor on York's state law claims for assault and battery.   Counts III and IV of York's Complaint will proceed to trial.

**DONE** and **ORDERED** this 16th day of November, 2023.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE